# EXHIBIT B

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>COMPLAINANT, )<br>)<br>v. )<br>)<br>**SPACE EXPLORATION TECHNOLOGIES** )<br>**CORP. d/b/a SPACEX,** )<br>)<br>RESPONDENT. )<br>) | 8 U.S.C. § 1324b PROCEEDING<br><br>OCAHO CASE NO. 2023B00082 |

## STATEMENT PURSUANT TO 28 C.F.R. §§ 68.3, 68.7(b)(5)

Pursuant to 28 C.F.R. §§ 68.3 and 68.7(b)(5), the United States of America hereby provides the Office of the Chief Administrative Hearing Officer the following service information in the above-captioned matter:

*For Complainant:*
Alberto J. Ruisanchez
Deputy Special Counsel

Julia Heming Segal
Special Litigation Counsel

Lisa Sandoval
Laura E. Varela-Addeo
Allena Martin
Trial Attorneys

U.S. Department of Justice
Civil Rights Division
Immigrant and Employee Rights Section
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Fax: (202) 616-5509
Email: Lisa.Sandoval@usdoj.gov

*For Respondent:*

Charles F. Connolly, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Robert S. Strauss Tower
2001 K Street, NW
Washington, DC 20006
Fax: (202) 887-4288
Email: cconnolly@akingump.com

Christopher Cardaci
SpaceX Corporate Counsel
1155 F St NW
Washington, DC 20004
Email: christopher.cardaci@spacex.com

Registered Agent
Corporation Service Company
251 Little Falls Dr.
Wilmington, DE 19808
Phone: (302) 636-5401

Dated: August 23, 2023

Respectfully Submitted,

ALBERTO J. RUISANCHEZ
Deputy Special Counsel

JULIA HEMING SEGAL
Special Litigation Counsel

LISA SANDOVAL
LAURA E. VARELA-ADDEO
ALLENA MARTIN
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Immigrant and Employee Rights Section
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 532-5736

Facsimile: (202) 616-5509
Email: Lisa.Sandoval@usdoj.gov

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>COMPLAINANT,<br><br>v.<br><br>SPACE EXPLORATION TECHNOLOGIES CORP. d/b/a SPACEX,<br><br>RESPONDENT. | 8 U.S.C. § 1324b PROCEEDING<br><br>OCAHO CASE NO. 2023B00082 |

## COMPLAINT

Complainant, the United States of America, alleges as follows:

1. From at least September 2018 to at least May 2022, SpaceX discriminated against asylees and refugees throughout its hiring process, including during recruiting, screening, and selection, in violation of the Immigration and Nationality Act ("INA"). Because of their citizenship status, asylees and refugees had virtually no chance of being fairly considered for or hired for a job at SpaceX.

2. In online postings and statements by SpaceX's CEO and other SpaceX officials and recruiters, SpaceX discouraged asylees and refugees from applying to the company by wrongly stating that SpaceX can only hire U.S. citizens and lawful permanent residents.

3. As to those asylees and refugees who did apply for jobs at SpaceX, the company failed to fairly consider and refused to hire them because of their citizenship status.

4. SpaceX's discriminatory hiring practices were routine, widespread, and longstanding, and harmed asylees and refugees.

5. Complainant, through the Immigrant and Employee Rights Section ("IER"), an office within

the Civil Rights Division of the U.S. Department of Justice, brings this action to enforce the anti-discrimination provision of the INA, 8 U.S.C. § 1324b, to stop SpaceX's discriminatory practices, and to seek relief for victims of discrimination.

## JURISDICTION

6. Pursuant to 8 U.S.C. § 1324b(d)(1), IER has authority to initiate investigations where it has reason to believe an employer has violated or is violating 8 U.S.C. § 1324b. IER also has authority to bring an action to ensure compliance with the statute. 8 U.S.C. § 1324b(c)(2).

7. Space Exploration Technologies Corporation, d/b/a SpaceX, a Delaware corporation, maintains its corporate headquarters at 1 Rocket Road, Hawthorne, California.

8. SpaceX employed more than three employees in the United States during the period of the discrimination described herein and therefore is a person or other entity subject to the anti-discrimination requirements of 8 U.S.C. § 1324b(a).

9. On May 29, 2020, IER, based on having a reason to believe that discrimination could be occurring, opened an independent investigation of SpaceX to determine if the company was engaging in any pattern or practice of discrimination in violation of 8 U.S.C. § 1324b.

10. On June 8, 2020, IER notified SpaceX that IER had initiated an investigation into whether SpaceX was engaging in any pattern or practice of discrimination in violation of 8 U.S.C. §§ 1324b(a)(1) or (a)(6) and requested information and documents related to its investigation.

11. On August 13, 2020, IER reiterated to SpaceX that it had initiated an investigation into whether SpaceX was engaging in a pattern or practice of discrimination based on citizenship or immigration status, in violation of 8 U.S.C. §§ 1324b(a)(1) or (a)(6).

12. SpaceX failed to provide documents responsive to IER's investigative requests, and IER sought and obtained a subpoena from the Office of the Chief Administrative Hearing Officer (OCAHO). On December 1, 2020, OCAHO Chief Administrative Law Judge Jean C. King denied SpaceX's petition to modify or revoke the OCAHO subpoena. IER then applied to the U.S. District Court for the Central District of California for an order requiring SpaceX to comply with the OCAHO subpoena. On June 30, 2021, a district court judge adopted a magistrate judge's report and recommendation enforcing IER's subpoena, and SpaceX produced the requested documents on August 3, 2021.

13. On November 30, 2022, IER notified SpaceX that IER had concluded its independent investigation and found reasonable cause to believe that SpaceX had engaged in a pattern or practice of unfair immigration-related employment practices in violation of 8 U.S.C. § 1324b(a)(1)(B).

14. Complainant files this Complaint with OCAHO pursuant to 8 U.S.C. § 1324b(e)(1).

15. OCAHO has jurisdiction to hear this matter alleging violations of 8 U.S.C. § 1324b. *See* 8 U.S.C. § 1324b(e)(1); 28 C.F.R. §§ 44.101(d), 68.1.

## BACKGROUND

16. Asylees and refugees are migrants to the United States who have fled their home countries due to a well-founded fear of persecution. Once they are granted asylee or refugee status by the United States government, they have indefinite permission to live and work in the United States. 8 U.S.C. § 1158(c)(1); *see also* U.S. CITIZENSHIP AND IMMIGR. SERV., HANDBOOK FOR EMPLOYERS M-274, *7.3 Refugees and Asylees*, https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/70-evidence-of-employment-authorization-for-

certain-categories/73-refugees-and-asylees (last updated July 26, 2023).

17. Lawful permanent residents also have permission to live and work in the United States permanently. 8 U.S.C § 1101(a)(20); *see also* U.S. CITIZENSHIP AND IMMIGR. SERV., HANDBOOK FOR EMPLOYERS M-274, *7.1 Lawful Permanent Residents (LPR)*, https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/70-evidence-of-employment-authorization-for-certain-categories/71-lawful-permanent-residents-lpr (last updated July 14, 2023). They are issued permanent resident cards, colloquially known as "green cards." Asylees and refugees are not issued green cards.

18. In 1986, Congress amended the INA to prohibit employment discrimination because of citizenship status or national origin in, among other things, hiring. 8 U.S.C. § 1324b(a)(1)(B).

19. Under 8 U.S.C. §§ 1324b(a)(1)(B) and (3), United States citizens and nationals, asylees, refugees, and certain lawful permanent residents, including those who actually hold these statuses or are perceived to hold them, are protected from discrimination in hiring based on citizenship status, unless the discrimination is required in order to comply with a law, regulation, executive order, government contract, or determination by the Attorney General. *See id.* § 1324b(a)(2)(C). That means that generally an employer cannot deter applicants, refuse to fairly consider them, or reject them for a job because of their citizenship or immigration status.

20. Citizenship status discrimination is prohibited during all stages of the hiring process, including recruiting, screening candidates, interviewing, and ultimately deciding whom to hire. *Eze v. W. Cnty. Transp. Agency*, 10 OCAHO no. 1140, 5 (2011).

21. Applicants are entitled to "equal, fair, and impartial consideration for employment." *Iron*

*Workers Local 455 v. Lake Constr. & Dev. Corp.*, 7 OCAHO no. 964, 632, 697 (1997). When employers fail to fairly consider workers based on their citizenship or immigration status, the workers' qualifications are irrelevant as to the question of liability. *Eze*, 10 OCAHO no. 1140 at 7.

## SPACEX AND EXPORT COMPLIANCE UNDER ITAR AND EAR

22. SpaceX designs, manufactures, and launches advanced rockets and spacecraft. Companies, like SpaceX, are subject to export control laws and regulations, including the International Traffic in Arms Regulations ("ITAR") and the Export Administration Regulations ("EAR"). *See* 22 C.F.R. pt. 120 (2023); 15 C.F.R. pt. 730 (2023).

23. ITAR and EAR restrict an employer's ability to export certain goods, software, technology, and technical data, referred to as export-controlled items.

24. SpaceX officials have repeatedly said publicly that they can only hire U.S. citizens and lawful permanent residents because of export control laws and regulations, like ITAR.

25. But export control laws and regulations do not prohibit or restrict employers from hiring asylees and refugees; those laws treat asylees and refugees just like U.S. citizens.

26. Under ITAR and EAR, "U.S. persons" working for U.S. companies can access export-controlled items without authorization from the U.S. government. A "U.S. person" under ITAR and EAR, includes a U.S. citizen or national, a lawful permanent resident, a refugee, or an asylee. 22 C.F.R. § 120.62; 15 C.F.R. pt. 772.

27. In contrast, a "foreign person"—anyone who is not a "U.S. person" under ITAR and EAR— may need authorization from the federal government to access export-controlled items. 22 C.F.R. §§ 120.62 and 120.63; 15 C.F.R. pt. 772. For a "foreign person" employee to access export-controlled items, their employer must apply to the U.S. Department of State or the

U.S. Department of Commerce and obtain approval.

28. SpaceX regularly conducts export compliance assessments, a process to check whether new and existing workers require authorization to access export-controlled items. During this process, new and existing workers identify their citizenship or immigration status and present documentation proving their citizenship or immigration status to show whether they are a "U.S. person" or "foreign person."

29. Despite SpaceX's claims, ITAR and EAR do not contain employment or hiring restrictions. They do not require employers to limit jobs based on citizenship or immigration status. And they do not prohibit employers from hiring asylees and refugees. Thus, they do not create an exception to hiring discrimination under 8 U.S.C. § 1324b(a)(2)(C).

## SPACEX EXECUTIVES' FACIALLY DISCRIMINATORY PUBLIC STATEMENTS

30. On June 16, 2020, SpaceX's CEO, who then had approximately 36 million followers on X, a social media platform formerly known as Twitter, posted, "U.S. law requires at least a green card to be hired at SpaceX, as rockets are advanced weapons technology."

> US law requires at least a green card to be hired at SpaceX, as rockets are considered advanced weapons technology
>
> 7:24 PM · Jun 16, 2020 · Twitter for iPhone
>
> 84 Retweets   16 Quote Tweets   1,536 Likes

31. Similarly, in an online video at an international space conference in September 2016, SpaceX's CEO stated that SpaceX had to comply with ITAR, which meant that a normal work visa is insufficient to work at SpaceX unless the company can obtain "special permission from the Secretary of Defense or Secretary of State." YouTube (Sept. 28, 2016), https://www.youtube.com/watch?v=CIvtiNpKEY0. He then added that SpaceX is "not

6

allowed" to hire people who don't have a "green card" and that "unless [you] can somehow get a green card, we are legally prevented from hiring anyone." *Id.* This video has been viewed more than 10.6 million times on YouTube.

32. In an online video from 2012, SpaceX's CEO said, when describing how to get a job at SpaceX, "It's quite difficult for us to employ people that don't have a green card because of U.S. ITAR rules." He added that his "first advice" to non-U.S. citizens who wanted to work at SpaceX would be, "Do anything you can to get a green card."

33. Other SpaceX officials made similar public statements. For instance, the Vice President of Human Resources stated in an online chat forum in 2016, "To comply with US government space technology export regulations including ITAR[,] applicants must generally be U.S. citizens or lawful permanent residents."

## SPACEX'S STANDARD HIRING PRACTICES

34. Staff at SpaceX's headquarters in Hawthorne, California, oversee the implementation of SpaceX's uniform hiring procedures, including those related to recruiting, screening, interviewing, and extending offers to job applicants.

35. SpaceX recruits and hires individuals to fill a wide variety of positions at the company, including welders, cooks, crane operators, information technology specialists, software engineers, dishwashers, business analysts, rocket engineers, marketing professionals, baristas, and more. Many positions at SpaceX require access to export-controlled items.

36. SpaceX engages in nationwide recruitment efforts and hosts and attends a variety of career fairs, such as university career fairs to attract intern and new graduate applicants.

37. SpaceX employees routinely engage in online recruiting by posting job advertisements and engaging virtually with job candidates on online forums, including LinkedIn, Monster,

Indeed, Handshake, Piazza, StackOverflow, Reddit, HopIn, HackerX, Veteran Recruiting, Airtable, and Brazen.

38. SpaceX hiring managers also routinely engage in recruiting and hiring efforts by discussing their roles at SpaceX with potential candidates, advertising open positions, and evaluating candidates.

39. From November 2014 to at least November 2020, a Manager of Technical Recruiting at SpaceX and other SpaceX recruiters regularly told job candidates that with a few exceptions, SpaceX is only able to hire U.S. citizens or lawful permanent residents due to ITAR.

40. From at least September 2018 to at least May 2022, SpaceX posted at least 14 public announcements, job advertisements, and other online recruiting communications stating that SpaceX can only hire U.S. citizens and lawful permanent residents due to ITAR.

41. For example, on September 21, 2020, a SpaceX university recruiter participated in a Georgia Institute of Technology ("Georgia Tech") Career Fair chat forum titled, "SpaceX Full-Time and Internship/Co-Op" with approximately 719 participants. In it, he announced, "Due to US Export Compliance regulations, SpaceX can only offer employment to US Citizens or Lawful Permanent Residents."

42. And on the same day, a SpaceX engineer posted a different job announcement in the same chat forum that stated, "Sadly must be a US citizen" to apply, even though the position did not require U.S. citizenship.

43. From at least September 2018 to at least May 2022, SpaceX's job application required candidates to identify their citizenship or immigration status by selecting one of the following options: "U.S. citizen or national of the United States," "U.S. lawful permanent resident," "refugee under 8 U.S.C. 1157," "asylee under 8 U.S.C. 1158," or "other."

44. From at least September 2018 to at least May 2022, SpaceX tracked job applications using a database that allows recruiters and hiring managers to see applicants' self-identified citizenship or immigration status and reject job candidates by using a variety of rejection codes, including "not authorized to work/ITAR ineligible."

45. From at least September 2018 to at least May 2022, SpaceX officials repeatedly rejected applicants who identified as asylees or refugees by using the rejection code titled, "not authorized to work/ITAR ineligible." Put differently, SpaceX's own hiring records show that SpaceX repeatedly rejected applicants who identified as asylees or refugees because it believed that they were ineligible to be hired due to ITAR.

46. For example, on or around August 27, 2021, a recruiter rejected an asylee applicant with the code "not authorized to work/ITAR ineligible" and told the applicant that SpaceX could not hire him because he was not a U.S. citizen or lawful permanent resident, despite the fact that the hiring manager had noted that the applicant had "some impressive experience listed."

47. On another occasion, a recruiter used the rejection code "not authorized to work/ITAR ineligible" to reject an asylee who had more than nine years of relevant engineering experience and had graduated from Georgia Tech University.

48. From at least September 2018 to at least May 2022, SpaceX officials repeatedly used other rejection codes that appeared to be neutral (such as "does not meet basic qualifications" or "does not meet preferred qualifications") to reject self-identified asylees and refugees, but the rejection was because of their citizenship or immigration status.

49. For example, on June 22, 2020, a senior recruiter rejected an asylee applicant using the code "doesn't meet preferred qualification," and a hiring manager listed the reason as, "not U.S. citizen or green card."

9

50. SpaceX officials repeatedly made explicit references to asylee or refugee applicants' citizenship or immigration status as the basis for refusing to hire them, such as "non-ITAR candidate," "not USC or green card," "doesn't meet ITAR," and "doesn't meet US resident requirement."

51. From at least September 2018 to at least May 2022, SpaceX rejected applicants, at least some of whom were qualified, who identified as asylees or refugees based on their citizenship or immigration status.

## SPACEX'S HIRING RATES

52. According to data SpaceX provided to the federal government, from September 1, 2018, to September 30, 2020, SpaceX hired only U.S. citizens and lawful permanent residents.

53. According to data SpaceX provided to the federal government, from September 2018 to May 2022, out of more than 10,000 hires, SpaceX hired only one individual who was an asylee and identified as such in his application. SpaceX hired this asylee approximately four months after IER notified the company of its investigation. From September 2018 to May 2022, SpaceX did not hire any individuals who were refugees and identified as such in their applications.

## COUNT
## PATTERN OR PRACTICE OF DISCRIMINATION AGAINST ASYLEES AND REFUGEES IN THE HIRING PROCESS

54. Complainant incorporates by reference the allegations set forth in Paragraphs 1 through 53 as if fully set forth herein.

55. SpaceX's standard operating procedure beginning no later than September 2018 and continuing to at least May 2022, was to intentionally discriminate against individuals who were, or whom SpaceX perceived to be, asylees and refugees based on citizenship status at

various stages of the hiring process, including during recruiting, screening, and selection by:

    a. Discouraging them from applying to the company and making and posting facially discriminatory statements indicating that SpaceX can only hire U.S. citizens and lawful permanent residents;

    b. Failing to fairly consider those who did apply for employment; and

    c. Refusing to hire those who were qualified applicants.

56. By routinely communicating its policy of hiring only U.S. citizens and lawful permanent residents due to ITAR, SpaceX intended to exclude individuals who were, or whom SpaceX perceived to be, asylees and refugees from the applicant pool, from consideration, and from hire based on citizenship status.

57. SpaceX discriminated against individuals who were, or whom it perceived to be, asylees and refugees because of citizenship or immigration status during the hiring process by: (1) deterring them from applying, (2) categorically excluding them from consideration, and/or (3) failing to fairly consider or hire them.

58. SpaceX's actions constitute a pattern or practice of discrimination prohibited under 8 U.S.C. § 1324b(a)(1)(B) against applicants who self-identified as asylees and refugees.

59. At least some of the applicants who self-identified as asylees and refugees and whom SpaceX subjected to its pattern or practice of discrimination prohibited under 8 U.S.C. § 1324b(a)(1)(B) were qualified for the positions they sought.

60. Asylees and refugees who would have applied to SpaceX's positions but for the discriminatory practices, had a real and present interest in working for SpaceX but were deterred from applying because of SpaceX's discriminatory practices.

61. No law; regulation; executive order; provision of Federal, State or local government contract;

or Attorney General determination justifies SpaceX's pattern or practice of hiring discrimination against asylees and refugees.

## **REQUEST FOR RELIEF**

THEREFORE, Complainant respectfully requests:

That the Administrative Law Judge assigned to this proceeding grant the following relief:

1. Order SpaceX to cease and desist from the illegal practices described in the Complaint and to take affirmative steps to address the illegal practices, including any and all relief provided under 8 U.S.C. § 1324b(g)(2);

2. Order SpaceX to pay an appropriate civil penalty as determined by the Administrative Law Judge for each individual discriminated against in violation of 8 U.S.C. § 1324b(a)(1)(B);

3. Order SpaceX to provide fair consideration to each applicant who identified as an asylee or a refugee but was improperly screened out or rejected, or who was an asylee or a refugee and was deterred from applying, based on citizenship status;

4. Order SpaceX to hire applicants who were victims of the discriminatory practices alleged in this Complaint and were qualified for employment;

5. Order SpaceX to pay back pay, including interest, and all other relief available to each individual discriminated against who was qualified and who is found to have suffered uncompensated lost wages due to denied or delayed employment as a result of the discriminatory practices alleged in this Complaint; and

6. Order such additional relief as justice may require.

Dated: August 23, 2023

Respectfully Submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

KATHLEEN P. WOLFE
Deputy Assistant Attorney General

ABIGAIL A. NURSE
Senior Counsel

/s/ Alberto J. Ruisanchez
ALBERTO J. RUISANCHEZ
Deputy Special Counsel

JULIA HEMING SEGAL
Special Litigation Counsel

LISA SANDOVAL
LAURA E. VARELA-ADDEO
ALLENA MARTIN
Trial Attorneys

U.S. Department of Justice
Civil Rights Division
Immigrant and Employee Rights Section
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 532-5736
Facsimile: (202) 616-5509
Email: Lisa.Sandoval@usdoj.gov